Hoyt *v.* Dewey et al.

ROMEO H. HOYT *v.* CLARISSA N. DEWEY AND HENRY R. BRIGHAM.

[ IN CHANCERY. ]

*Recovery of Money Paid or Property Conveyed under Duress or upon Fraudulent Inducement.*

Money paid to prevent the exposure of the payer's misconduct, whether criminal or otherwise, cannot be recovered in equity.

Money paid or property conveyed under duress or upon fraudulent inducement may be recovered in equity. Thus ; H., who had long been on terms of friendly intimacy with D., a female neighbor, made an assault on her in her own house, with intent to ravish. He had already on several occasions passed the limits of conventional propriety in his intercourse with her, invited her by act and innuendo to an adulterous intercourse with him, and, several weeks before the time in question, had made a like assault upon her. There was no apparent change in the intimacy existing between them down to the time of the second assault, which was made at a meeting to which D. had agreed in the expectation that H. would assail her chastity, and that, under the observation of a person whom she had admitted into an adjoining apartment as a witness, according to pre-arrangement. Immediately after the second assault, D., appearing to be in great distress of mind, summoned B., her brother, who, acting in his sister's behalf, invited H. to an interview, and there charged him with an attempt to outrage his sister's person, and told him that she purposed to pursue him with such appliances as the law would afford, unless he gave her a large sum of money in compensation. On the following day H. paid a sum of money and conveyed property to B., for the use of D. H. filed a bill against D. and B., to recover the money and property. *Held,* that as the distress of D. was feigned, the money and property were procured by both fraud and duress, and that defendants should repay and reconvey the same.

APPEAL from the Court of Chancery.

The bill alleged that on August 23, 1875, the defendants, combining and conspiring, &c., falsely and maliciously threatened to accuse the orator of an assault with intent to rape defendant Dewey, and to prosecute him therefor, defendants then and there intending to defraud the orator of his good name, and to extort money from him to the amount ot $10,000 ; that defendants, in furtherance of said conspiracy, then and there extorted from the orator and procured him to pay to them the sum of $4,500 in money, and procured him to execute and deliver to defendant Brigham, for the benefit of defendant Dewey, a deed of warranty

59

of certain premises in St. Albans, known as the General Stannard Place, the consideration in which deed was $4,000, acknowledged to have been received from defendant Brigham; that said payment of money and the execution and delivery of said deed were wholly without valuable consideration; and that the orator had reason to fear and did fear that said Brigham, unless restrained, would convey said premises to some person without notice of said fraud. *Prayer* for an injunction restraining said Brigham from conveying or encumbering said premises or any portion thereof; for a decree ordering a reconveyance of said premises to the orator; and for general relief.

The answer of defendant Dewey alleged that at and for a long time before the date in the bill mentioned, said defendant was a widow, and resided with her children in a house adjoining and near the residence of the orator, in St. Albans; that she had long been on terms of familiar social intercourse with the orator and his family, and regarded them as near friends, and reposed great confidence in them; that after the death of her husband, the orator frequently visited her in a familiar way, without thought on her part that he had any improper intention in so doing, and was received by her as a neighbor and friend; that about thirty days before the date in the bill alleged, the orator began to make proposals of adulterous intercourse to her, which she repelled and refused, but which he from time to time continued to urge; that said defendant was greatly distressed and alarmed by said importunities, and endeavored by every means in her power to escape therefrom, but that, living alone with her children and so near the orator's residence, she could not prevent his coming to her house without raising scandal that she feared to encounter; that on an evening of about said date, the orator came to her house upon pretence of business or of some errand, and, being alone with her in her sitting-room, renewed his improper proposals to her, and urged them with great pertinacity, and finally, for the accomplishment of his purpose, assaulted and laid hands upon her, whereupon she made such resistance and outcry as to attract the attention of a person in the house, when the orator desisted, and went out of the house; that feeling greatly aggrieved and insulted by what had transpired, and being aware that the orator's importunities would probably be renewed unless effectual means were taken to prevent them, she caused a telegram to be sent to defendant Brigham, her brother, who resided in Boston, saying that she was in trouble and desired him to come to St. Albans immediately; that Brigham came the next day, and was immediately informed by her of all that had taken place as aforesaid;

that said Brigham thereupon had an interview with the orator at which defendant Clarissa was not present, but during which, as she was informed and believed, the orator admitted the truth of said charges, expressed great contrition, and an anxious desire to settle the difficulty, and proposed and urged that said Brigham should accept in reparation, for defendant Clarissa, a conveyance of property for her benefit, and proposed to convey to him for the use of said Clarissa the premises mentioned in the bill, and also certain bank stock; that said Brigham at first refused to accept that or any pecuniary reparation, but was finally induced to believe that it would be best to accept that proposition, and so advised said Clarissa; that she reluctantly agreed thereto, upon the assurance that the orator's importunities should never be in any way renewed; and that on the next day, as said Clarissa was informed and believed, the orator and said Brigham again met, when the orator was informed that his proposition was accepted, and that said deed was duly executed and delivered, and $4,500 in money paid to said Brigham, at the orator's suggestion, in lieu of said bank stock. The answer denied that there was any combination or conspiracy between said Clarissa and her brother, or any previous understanding between them for the purpose of obtaining money or property from the orator; or that said Clarissa accused or threatened to accuse the orator of an attempt to commit rape; or that any fraud or duress was used by her in the matter of said conveyance and payment, or, to her knowledge and belief, by her brother; and averred that before said interview between her brother and the orator, she had no idea or expectation that any pecuniary reparation would be asked or received from the orator, and had no conversation with her brother on that subject; and that said conveyance and payment were therefore voluntary, founded on sufficient consideration, and valid and binding.

The answer of defendant Brigham was in substantial accord with that of defendant Clarissa, the only material difference being that certain matters alleged in her answer upon information and belief were in his alleged as true of his own knowledge, and conversely, and that from the answer of said Brigham it appeared that the deed in question was duly acknowledged and recorded, and the grantee thereunder duly placed in possession of the granted premises by personal notice to the tenants and by assignment of the policy of insurance.

The answers were traversed and testimony taken. It appeared that the orator and the defendant Clarissa, who was a widow with three young sons, had for many years lived with their respective families in adjacent houses in the village of St. Albans, and that during all that time there was a frequent interchange of neighborly courtesies and kindnesses, and a considerable intimacy between the two families. The testimony on the part of the orator tended to show, that in the evening of August 23, 1875, the orator, having before then from time to time, in word if not in deed, passed the bounds of conventional propriety in familiar intercourse with defendant Clarissa, went to her house by her invitation, and was there surprised, sitting by her side in her sitting-room with his hand lying in her lap, in the course of a conversation so contrived as to put him in a false light, by a female friend of said defendant's who had been introduced into the house and placed in an adjoining room for that purpose, and who came in upon them on the giving of a preconcerted signal, and, by implication at least, charged the orator with attempted improprieties, whereupon, after some expostulation and mention of conspiracy on the part of the orator, and some incoherent conversation in which all took part, the orator went home ; that one evening two or three days thereafter, the orator received a note from defendant Brigham, asking the orator to meet him that evening at 8 o'clock at said Clarissa's, which the orator did, whereupon, after some conversation upon indifferent topics, Brigham charged him with an attempt to commit a rape upon defendant Clarissa, and told him that unless he gave her $10,000 by the next day morning at 9 o'clock, he would prosecute him ; that being shocked and bewildered, and dreading the exhibition of himself in a perverted light to his family and the public, he agreed to convey to said Brigham property in St. Albans known as the General Stannard House, worth about $4,000, and to transfer to him thirty shares of bank stock of the value of $4,500, and executed a memorandum of that agreement, and gave it to Brigham. It was not disputed that on the next morning the orator met Brigham agreeably to appointment, and executed, acknowledged, and delivered a deed of the house as agreed, assigned the insurance thereon, notified

the tenant of the sale, and paid over $4,500 in money in lieu of the bank stock; but the orator's testimony tended to show that he was at the time unwontedly nervous and excited. There was testimony on the orator's part tending in some degree to show that the defendant Clarissa had on various occasions conducted herself in some respects indelicately, and the orator's own testimony tended to show that she had extended a *quasi* invitation to him for the commission on his part of the acts aforesaid.

The defendants' testimony tended to show that during the summer of 1875, the orator had frequently, by act and innuendo, invited said Clarissa to acts of adulterous intercourse with him, but that she had resisted and repelled his advances; that on July 9th of that year, he assaulted her in her own house, with intent to force her to such intercourse against her will, but that she successfully resisted until some one came to the house by accident, when the orator desisted and went away; that on the evening of August 23d, the orator came to her house, and after sitting for a while a little distance from her, talking on indifferent subjects, finally took a seat by her side, facing her, whereupon she told him that she knew his business there, and that such conduct must cease; that conversation ensued, as detailed in the opinion of the court; that after sitting a while, he sprang toward her, threw his head and shoulders into her lap, put one hand under her skirts and the other against her side; that she resisted and said: " Come, come, this has gone far enough "; that Mrs. Bassett, a friend whom she had invited to spend the evening with her, and whom she had admitted by a rear door shortly after the orator came in, then stepped in from the nursery, an adjoining room, to the orator's confusion, and expressed her surprise to find the orator treating said defendant in such a manner; that after some conversation in which the orator expressed great regret for his conduct, and asked that it might be kept secret, he went home; that said Clarissa was greatly alarmed and disturbed in mind, and, in her distress, sent by telegraph for her brother to come to her at once for her counsel and protection; that her brother came, and, acting in her behalf, charged the orator with having attempted to outrage her person; that the orator acknowledged the truth of the charge, expressed

great contrition, and said that if $1000 would recompense her for the wrong he had done her he would gladly give it; that after some discussion it was agreed that the orator should give property, as shown by the orator's testimony, in settlement of the injury done to defendant Clarissa, and that the agreement was carried out accordingly.

It appeared that shortly before August 23, said Clarissa had taken counsel of a lawyer and of an intimate friend, Dr. Branch, in regard to the orator's pursuit of her, but that her familiarity with the orator, and the frequent if not daily performance of acts of courtesy and kindness on his part, such as the bringing of her mail, continued down to that date; and that she agreed with him for the meeting on the evening of that day; but the testimony as to which of them suggested the meeting was contradictory. There was also evidence on the part of the defendants tending to rebut the testimony imputing immodesty to the defendant Clarissa. The facts material to the issue not herein stated, appear from the opinion of the court.

At the hearing at the September Term, 1876, the court, ROYCE, Chancellor, considered that the conveyance of said premises and the payment of said sum of money were extorted by threats of a criminal prosecution, and were not made in compensation for personal injury, and that they were therefore without consideration; and entered a decree ordering the defendant Brigham to reconvey said premises to the orator, and to pay to him said sum of money, with costs.   Appeal by the defendants.

*E. J. Phelps* and *G. A. Ballard*, for the defendants.

The grounds upon which the conveyance is sought to be avoided, as set forth in the bill, do not make a case that could stand against a general demurrer.   So, if the orator succeeds, it must be upon some ground to be established outside of the bill.   But the case sought to be made by the orator's testimony would afford no ground on which a court of equity could decree a reconveyance. To yield to a mere threat of the kind sought to be shown, would be simply one of those follies from the consequences of which the law cannot relieve, unless the wrong is practiced on a person

of such mental weakness or infirmity as entitles him to relief on that score. Of that there is no pretence in this case. Such a threat is in no sense a fraud. The orator was deceived about nothing. His knowledge was necessarily complete. Nor is the mere want of actual consideration any ground for setting aside an executed deed where the grantor voluntarily executes it, understanding that it is without consideration. A voluntary gift, legally executed, is valid against the grantor, if there is no other ground for impeaching it. *Viney* v. *Abbott*, 109 Mass. 300, and cases cited; *Bunn* v. *Winthrop*, 1 Johns. Ch. 329. The orator's case, therefore, upon his own testimony, must rest exclusively on the proposition, that the mere naked threat of a criminal prosecution constitutes such duress or compulsion as to render a deed executed in consequence of it void. And that is the only ground stated in the bill on which the conveyance is claimed to be invalid. Such a proposition cannot be maintained on either principle or authority. "For menaces, in four instances a man may avoid his own acts. 1. For fear of loss of life. 2. Of loss of member. 3. Of mayhem. 4. Of imprisonment." 2 Bac. Ab. Duress, A., citing Coke; 2 Kent.Com. 453; 2 Greenl. Ev. s. 301; 1 Parsons Cont. 393–4; *Evans* v. *Gale*, 18 N. H. 401. The threats must be such as a person of ordinary firmness would yield to. *Brownell* v. *Talcott*, 47 Vt. 243; *Harmon* v. *Harmon*, 61 Me. 227. They must have induced such actual fear as controlled the action of the party affected. *Grimes* v. *Gates*, 47 Vt. 595; *Foss* v. *Hildreth*, 10 Allen, 76; *Alexander* v. *Pierce*, 10 N. Y. 494. Where the threat relied on is of imprisonment, it must be a threat of immediate and actual arrest, raising a present and imminent danger of confinement. A general threat of criminal prosecution is not sufficient, and does not amount to a threat of imprisonment. *Harmon* v. *Harmon*, 61 Me. 227. See also *Miller* v. *Miller*, 68 Penn. 486; *Cahaba* v. *Burnett*, 34 Ala. 400. Tested by the rules of law, therefore, the case as claimed by the orator utterly fails.

But the orator's story is not true. The truth is, that the orator, after persecuting Mrs. Dewey for a long time with improper advances, actually laid hands on her, not for the purpose of rape,

probably, but with the intention of accomplishing his object. And when threatened with exposure and legal proceedings, he voluntarily and deliberately purchased immunity, and settled the cause of action existing against him, by the payment and the conveyance in question. Such is the case stated in the answers, which fully and explicitly deny upon personal knowledge the statements in the bill. It is therefore for the orator to establish his case, and to overcome, by testimony equivalent to that of two witnesses, the evidence afforded by the answers. *Field* v. *Wilbur*, 49 Vt. 157, 163; *Veile* v. *Blodgett*, 49 Vt. 277; *Shattuck* v. *Gay*, 45 Vt. 87. But upon the evidence, the result is still stronger against the orator.

The case established by the evidence renders the "conveyance in question perfectly valid. The orator had committed an assault for which he was liable. In settlement of his liability, and to avoid the publicity the enforcement of it would entail, he made the conveyance. He was under no duress, and was affected by no fraud. To demand a settlement, and to threaten to prosecute a just claim is perfectly lawful. An adjustment or compromise of even a doubtful claim is a good consideration for a payment. *Commonwealth* v. *Jones*, 121 Mass. 57; *Taylor* v. *Cottrell*, 16 Ill. 93; *Miller* v. *Hawker*, 66 Ill. 185; *Russell* v. *Cook*, 3 Hill, 504; *Longridge* v. *Dorville*, 5 B. & Ald. 117; *O'Keeson* v. *Barclay*, 2 Penn. 537. And even if a claim be wholly invalid, a voluntary payment in settlement of it, if made with knowledge of the facts and without fraud, is binding. *Evans* v. *Gale*, 18 N. H. 401; 15 Am. Rep. 323.

In no view can the decree be sustained. It directs not only a reconveyance of the real estate, but a repayment of the $4,500 in money. The bill contains no prayer for such a repayment, and no statement of facts on which to found it. A separate and independent cause of action not set forth in the bill nor included in the prayer, cannot be proved and recovered under the general prayer for relief. Nor could such a right be enforced in equity. If the liability exists, it is simply a liability at law, recoverable in an action of general assumpsit.

*H. C. Adams, W. D. Wilson, A. G. Safford,* and *H. S. Royce,* for the orator.

It appears from the testimony that Brigham, with the intent to extort money from the orator, charged the orator with an assault with intent to commit rape, knowing that the charge was false, and threatened to begin a criminal prosecution unless the orator paid $10,000 ; and that the orator, overcome by terror and apprehension of the discredit and suffering that would result from the promulgation of such charges, and thereby deprived, for the time, of his senses, made the payment and conveyance in question, thinking that if he complied with such demands he would escape such discredit and suffering. Proof of these facts establishes the right of the orator to recover. *Sartwell* v. *Horton,* 28 Vt. 370 ; *Eadie* v. *Slimmon,* 26 N. Y. 9 ; *Taylor* v. *Jaques,* 106 Mass. 291 ; *Osborne* v. *Robbins,* 36 N. Y. 365 ; *Foshay* v. *Ferguson,* 5 Hill, 154 ; *Cadaval* v. *Collins,* 4 A. & E. 858 ; *Baker* v. *Morton,* 12 Wall. 150 ; *Brownell* v. *Talcott,* 47 Vt. 243 ; *Briggs* v. *Boyd,* 56 N. Y. 289 ; *Bailey* v. *Williams,* 4 Gif. 638 ; 2 Kent. Com. 452 ; 1 Story Eq. Jurisp. 239, 315.

The opinion of the court was delivered by

REDFIELD, J. The orator's case, in brief statement, is, that he had long been on terms of neighborly intimacy with Mrs. Dewey, one of the defendants, for many years, and had on several occasions passed the boundaries of conventional propriety in language, if not in act, in familiar intercourse with her ; that she made that the occasion for charging upon him an assault with intent to ravish, and exacting a large sum of money as compensation for such great wrong ; and that in the dread of exposure and the exhibition of himself in a perverted light to his family and the public, he complied with her exactions and paid her $10,000.

The orator, having paid money to suppress the exposure of his own misconduct, whether criminal or otherwise, can find no aid or assistance in a court of equity. However degrading and painful to him, and however unreasonable the exactions, a court of equity will not lend its aid to repair the consequences of his own folly. If he paid a large and disproportionate sum to bury out of

sight a fault, whether it appertained to him alone, or whether, if exposed, it worked alike the disgrace of both parties, he must stand by what he has voluntarily done, or, rather, the law, whose office it is to protect innocence and redress wrong, will not debase itself by balancing equities in dividing spoil among highwaymen, nor draggle in the pool of infamy to repair the consequences of voluntary pollution. If the orator has paid money to suppress the public exposure of his shame, " the fool and his money have parted," and he must wash, and reinstate himself in decent society as best he can ; the law will extend to him neither succor nor sympathy.

But this is not the whole of this case. The defendants' evidence tends to show, and it is claimed to have been proven on the part of Mrs. Dewey, that the orator, during the summer of 1875, frequently invited her to acts of adulterous intercourse with him, which she had declined ; and that on the 23d of August of that year, he made an assault upon her with intent to have such intercourse with her by force and against her will. That she resisted his approaches, and, by the timely interposition of a friend, she escaped from his criminal violence. That this attempted violence so shocked her sensibilities and so disturbed her peace of mind, that, in her trouble, brought upon her by this great outrage, she sent by telegraph for her brother (the other defendant) to come to her at once for counsel and protection. That he came, and, acting in her behalf, charged the orator with having attempted to outrage her person ; and that she proposed to pursue him with such appliances as the law would afford, unless he gave her redress and compensation by a large sum of money ; and the sum of $10,000 seems to have been aimed at from the beginning.

The important inquiry and hinge on which the case turns, suggests itself *in limine*. Was this claim, on the part of Mrs. Dewey, that she was suffering from a great shock to her feelings and sensibilities by reason of this outrage of the orator, real or simulated ? Did she feel and think as she now claims, or was her claim feigned, and her programme pre-arranged for an ulterior purpose ? She testified, in substance, that the orator had not only invited her to an adulterous intercourse frequently, but had, on the 9th of July

of that year, assaulted her with intent to force adulterous inter-
course against her will, which she successfully resisted.   Yet it is
not questioned in this case, that her familiar intimacy with the ora-
tor—allowing him to bring to her house, often if not daily, her
mail, and receiving other acts of courtesy and kindness—continued
down to the 23d of August.   That she agreed with him for a
meeting on the evening of that day ; and which party first
suggested that meeting does not seem to us material.   That
she expected that the orator would assail or tamper with her
chastity at that meeting.   That she *consulted* with a lawyer, and
her intimate friend, Dr. Branch, in reference to the matter ; and
procured Mrs. Bassett to be present and witness an assault upon
her chastity by the orator.   That Mrs. Bassett was assigned a
place in the nursery, where she could see and not be seen, and
her presence was unknown to the orator.   The orator and Mrs.
Dewey, apparently by mutual consent or mutual attraction, ar-
ranged themselves in chairs alongside and facing each other, and
continued a cozy, mutual interview for about half an hour, with
his hand, as she says, under her skirts, upon the subject of sexual
passions and their indulgence ; and she was called upon by the
orator to give reasons and explain why he was not her " affinity "
and favorite with whom to have such indulgence.

In the meantime, she says, he was making gradual approaches
to get control of her person, with such criminal purpose, when she
said in a loud voice : " *This thing has gone far enough*," where-
upon Mrs. Bassett, the invited witness, appeared on the stage, to
the consternation of the orator, and became an actor in the scene.
Mrs. Dewey had not receded, nor, as we learn, attempted to re-
cede, from the orator's lecherous dalliance, but remained in her
chair all the while and several minutes after Mrs. Bassett had
made her appearance.   We see no reason to doubt or debate that
at her will she could have at any time put an end to the orator's
attempted familiarity with her person—that she could easily have
put distance between them ; or, if she had merely risen upon her
feet, she would have escaped all danger or annoyance from him.
Or, if she had chosen, she could have expelled him from the house

in such manner that he would never have re-crossed her thresh-hold, except by her permission.

We have no occasion to discuss or question her chastity; but it is a perversion of the evidence, and of all experience, to conceive that she, from what occurred on the 23d of August, was suffering severely in mind or feeling from an attempted outrage upon her chastity. And there is no reason to think that what occurred on the 9th of July and the 23d of August was regarded by her in different light.

We think it a fair and just construction of the evidence, that by the appointed meeting—the procuring of the secret attendance of Mrs. Bassett—the summoning of the brother from Boston—the requisition upon the orator for $10,000, the responsible actors in this matter proposed from the beginning to do just what they did do; and that Mrs. Dewey believed and knew that the serious charge upon the orator of an attempted rape upon her person was simulated and unreal, and that the woman Bassett was procured to be a witness and actor in this scene for the purpose of giving a colorable advantage to the defendants in making this claim upon the orator.

Chastity is a virtue that finds a ready protection in our courts; but it is too sensitive and delicate a thing to be hawked in the market for speculation. That the orator should by his weakness and folly part with his fortune excites no special sympathy. But the law abhors the means and agencies employed in this case to extort money. And it is enough that the defendant knew that such means and agencies were feigned and fictitious. We find in this case both fraud and duress; and the case of *Sartwell* v. *Horton*, 28 Vt. 370, is a full and clear statement of the law that governs this case.

The decree of the Court of Chancery is affirmed, and the cause is remanded for final decree in that court.